Filed 9/23/21  P. v. Berardi CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D078050 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD193826) |
| GEORGE HENRY BERARDI, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, John M. Thompson, Judge.  Affirmed.

Charles R. Khoury, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Julie L. Garland, Assistant Attorneys General, Steve Oetting and Anthony Da Silva, Deputy Attorneys General, for Plaintiff and Respondent.

A second amended information filed on May 21, 2008, charged defendant George Henry Berardi and codefendant Daniel May with

conspiracy to commit murder (Pen. Code,[1] § 182, subd. (a); count 1) and murder (§ 187, subd. (a); count 2). The information additionally alleged gun-related enhancements as to both counts. (§§ 12022, subd. (a), 12022.5, subd. (a), & § 12022.53, subd. (d).) In January 2009, a jury found defendant guilty of first degree murder and conspiracy to commit murder and further found the special allegations to be true. Berardi was sentenced to 25 years to life with a one-year enhancement for being armed with a firearm during the commission of the offense. This court affirmed Berardi's conviction in 2012. (*People v. Berardi* (Jan. 12, 2012, D056544) [nonpub. opn.] (*Berardi*).)

In June 2019, defendant filed a petition to vacate his murder conviction pursuant to section 1170.95 (hereinafter, Petition). After appointing counsel and receiving briefing from the parties, the court denied defendant's Petition without issuing an order to show cause (OSC), finding that defendant was not entitled to section 1170.95 relief. We affirm.

FACTUAL BACKGROUND[2]

A.    *The Kegler-Winchell-Berardi Love Triangle*

The victim, Marcus Kegler, met Desiree Winchell when they were in junior high school together, and they became good friends. However, in 2000 Kegler left California and moved to Mississippi.

After Kegler left California, Winchell became romantically involved with Berardi. By 2004, Winchell and Berardi had begun living together.

---

[1]    All further statutory references are to the Penal Code.

[2]    The factual background is taken from this court's nonpublished opinion in defendant's prior appeal, in which this court affirmed the judgment. (*Berardi, supra*, D056544; Evid. Code, § 452, subd. (d).) We also grant defendant's request for judicial notice of the trial record in case No. SCD193826, *People v. George Berardi et al.* (Evid. Code, § 452, subd. (d).)

May, who was Berardi's best friend, lived in the same house with Winchell and Berardi.

By the end of 2004 or the beginning of 2005, the Winchell-Berardi relationship had deteriorated, and they fought frequently. In January 2005, Winchell decided to end their relationship and told Berardi of her decision. Berardi asked her to give him until July to show the relationship could work, and she agreed, but the arguing persisted.

In January 2005 Winchell received an unexpected phone call from Kegler and they resumed their friendship. Berardi was aware of their communications and these contacts became another source of conflict between Berardi and Winchell.

At the end of April 2005, Winchell moved out of the house she was sharing with Berardi. As Winchell was moving out, Berardi tried to stop her. He smashed her cell phone on the ground, physically pinned her down, and told her she was not going to leave. Winchell nevertheless moved out and began living with her mother.

Around the time she began living with her mother, Winchell also purchased an airline ticket for Kegler to visit her in San Diego. Kegler arrived in early May 2005 to visit. Although Kegler initially planned to stay for only a week, he decided to stay indefinitely in San Diego and moved into his uncle's home on Castle Glen Drive in San Diego. Winchell and Kegler began a romantic relationship, and he stayed on occasion with Winchell in her apartment.

When Winchell left Berardi, she took some possessions belonging to him and Berardi later went to Winchell's apartment to collect them. Kegler was present when Berardi arrived. Berardi became angry, said Kegler should not be there, and sped away. Berardi called a few minutes later and

argued with Winchell on the telephone. Kegler took the phone from Winchell and argued with Berardi, and the two men threatened each other.

At the end of May 2005, Berardi went to Los Angeles accompanied by Winchell. While in Los Angeles, Berardi tried to convince her to marry him, but she refused. After a short stay in Los Angeles, Berardi returned to San Diego in late June or early July 2005. Berardi (along with May) began staying at the apartment of Nathaniel Green (a friend of Berardi) and Anna Tong (Green's girlfriend). The apartment was approximately one block east of Castle Glen Drive.

B.    *The Murder*

In the early evening of July 8, 2005, Kegler was shot in a cul-de-sac near his uncle's home. He later died from this injury. The shooting site was near Green's apartment. The events of the day leading up to the shooting formed a significant aspect for the prosecution's case against Berardi and May.

1.    *Kegler's Planned Meeting With Berardi*

Kegler and Winchell were scheduled to go to Ms. Wiggins's home on the evening Kegler was killed. Earlier during that day, Kegler called Wiggins to tell her he was trying to buy some marijuana to bring with him to Wiggins's home. He told Wiggins he was planning to meet with Berardi around 3:00 p.m. that afternoon to acquire the marijuana. Wiggins expressed concerns to Kegler about dealing with Berardi because Berardi was unhappy about Kegler's relationship with Winchell.

In the two hours before the scheduled meeting between Berardi and Kegler, Berardi's cell phone records showed repeated calls from Berardi's cell phone to Green (the apparent source for the marijuana) but Green did not answer. The records also showed several phone calls from Kegler to Berardi

4

during that afternoon. The planned mid-afternoon rendezvous between Berardi and Kegler did not occur because Berardi was unable to obtain the marijuana for Kegler.

However, when Kegler left work around 4:00 p.m., a coworker (Mr. Zanina) gave him a ride to Kegler's residence on Castle Glen Drive. On the way, Kegler told Zanina he planned to buy some marijuana later that day from his girlfriend's ex-boyfriend. After Kegler got home, phone records showed several more calls were placed between Kegler and Berardi between 4:00 p.m. and 6:00 p.m.

### 2. *Berardi Establishes His Alibi*

Around 5:30 p.m., Winchell arrived at Kegler's apartment. Kegler told Winchell he was almost ready to leave for Wiggins's residence, and Winchell phoned Wiggins at 5:35 p.m. and left a message for Wiggins that they would be leaving soon. However, at 5:41 p.m., Berardi phoned Kegler, and at 5:51 p.m., Kegler returned Berardi's telephone call. Ms. Tong, who was with Berardi when he received the latter phone call, overheard Berardi mention a quarter pound of marijuana, a price, and the cul-de-sac, and Berardi told Kegler they would meet immediately and that Berardi would be at the meeting.

Berardi did not go to the meeting with Kegler. Instead, after stopping briefly at a 7-Eleven Store, Berardi and Tong went to the restaurant. While there, Berardi told Tong that May was going to shoot Kegler because Berardi wanted Kegler dead, and that Berardi planned to keep the receipts from their visits to the 7-Eleven Store and the restaurant for his alibi, and that Tong (as well as a friend of Berardi's who worked at the restaurant) would verify his alibi. While still at the restaurant, Berardi received a call from May, and Tong overheard May report that the "pizza has been delivered." Berardi

5

decided they could leave because the "coast was clear" and told Tong that, if anyone asked, Tong should tell them that Berardi had been with her at the 7-Eleven Store and the restaurant.

### 3. May Meets With and Shoots Kegler

Meanwhile, Kegler (apparently in response to his last phone conversation with Berardi) woke Winchell up around 6:15 p.m. and told her he was leaving the Castle Glen Drive apartment but would be right back. He did not say where he was going or what he needed to do, and Winchell fell back asleep.

At Green's apartment, after Berardi and Tong left for the restaurant, May asked Green to supply him with a quarter pound of marijuana that May was to sell to someone. Green did not know the identity of May's customer. May took the marijuana and left to meet with Kegler. He returned about 15 to 20 minutes later, and Green overheard May speaking on the phone and saying something about "the pizza." Mr. Cameron testified he was at the apartment when May left with the marijuana and that, when he returned, May was calm.

At 6:17 p.m., a local resident discovered Kegler lying on the ground and called 911. Police and paramedics arrived, and Kegler was taken to a hospital, where he later died from a gunshot wound to the head.

### C. The Investigation and Subsequent Events

After police arrived and questioned Winchell, they went to Green's apartment and separately questioned Tong and Berardi. Tong did not reveal the events at that time because she did not want to get involved. Police did not arrest Berardi because he denied any knowledge of the shooting and his proffered alibi was corroborated by Tong. After police left, Tong went to her

6

room to shower. She found May hiding in a closet, and May later told Tong that he had shot Kegler at close range in the head.

May decided to leave town because he was scared. Surveillance tapes from the Greyhound Bus depot in San Diego showed May was at the ticket counter at 12:45 a.m. on July 9 purchasing a ticket for Las Vegas and showed May in line to board the bus at 6:26 a.m. that morning.

Berardi subsequently told police May was in Las Vegas, and Las Vegas authorities arrested May at the request of San Diego police. Detective Young interviewed May on August 26, 2005, but later released him. However, on August 31, 2005, Detective Young again interviewed May by phone, and during this interview, May confessed to shooting Kegler. May claimed that he went to sell marijuana to Kegler and, after giving it to him, May "freaked out" when Kegler reached into his pocket. May claimed he thought Kegler was reaching for a gun, and reacted by shooting Kegler. When Young informed him that no gun had been found, May began to cry and ended the phone call.

In September 2005, when May was in custody in San Diego, he agreed to do a video reenactment of the shooting, and the video reenactment was played for the jury. The jury also viewed a videotape, taken by a security camera from a nearby business, which was running during the shooting.

D.     *Defense Evidence*

The defense attacked Tong's credibility through several avenues. First, the defense relied on her admissions that she did not tell police about her conversation with Berardi at the restaurant  or about May's involvement when she was initially interviewed, and did not tell police about the conversation until many months later, and that she asked for immunity from any possible charges arising from the events. Second, the defense called

7

Lucas Irwin, Tong's former husband, who testified she lied about him in court during a prior custody dispute and that she was a vindictive person. Third, the defense showed Tong bore animosity towards Berardi and was willing to do anything, including lie, to get Berardi out of Green's life.

The defense also introduced the testimony of Mr. and Mrs. Burkheart, May's employers in Las Vegas, who testified he was an honest, nonviolent person. Mrs. Burkheart also testified she was present when May had the telephone interview with a San Diego detective concerning the shooting. Mrs. Burkheart testified that, after May hung up, he was distraught because the detective told May that Kegler had been unarmed and May said he thought Kegler had a gun.

PROCEDURAL BACKGROUND

On June 6, 2019, defendant filed the Petition declaring that he was entitled to relief on the ground that, pursuant to the changes to section 189, he could not now be convicted of first degree felony because he was not the actual killer. Although the form petition required that he also declare that he did not act with the intent to kill and that he was not a major participant in the felony or acted with reckless indifference to human life, defendant left those boxes unchecked.

The People filed an initial response challenging (1) the constitutionality of Senate Bill No. 1437, which enacted section 1170.95, and (2) defendant's statutory eligibility for resentencing. Defendant, represented by counsel, then filed a reply to the prosecution's response.

The trial court denied the Petition on August 27, 2020, without issuing an OSC. In its order, the court summarized the facts set forth in *Berardi*, reproduced *ante*, and found that, although defendant was not the actual killer, "the jury found Petitioner and Co-defendant May had entered into a

8

conspiracy to commit murder and the jury also convicted Petitioner of first-degree murder.  Thus, based on the facts as set forth above and the findings made by the jury, Petitioner was not the actual killer, but, with the intent to kill, he counseled, commanded, induced, or assisted the actual killer in the commission of the first-degree murder.  Accordingly, Petitioner falls within Penal Code section 188(e)(2) and he is not statutorily eligible for Penal Code section 1170.95 relief."

## DISCUSSION

Defendant raises two issues on appeal.  First, he contends the trial court erred by relying on the record of conviction to determine that defendant is ineligible for relief.  Second, he claims the trial court should have issued an OSC because there was a possibility that the jury convicted on a natural and probable consequences theory.  The People contend the court properly denied the Petition because defendant was not eligible for resentencing since he was convicted of conspiracy to commit murder and because the record of conviction does not support his claim that the charges may have been based on the natural and probable consequences theory.  We agree with the People.

### A. *Senate Bill No. 1437*

#### 1. *Statutory Changes*

Effective January 1, 2019, Senate Bill No. 1437 was enacted to "amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)  In furtherance of this goal, it amended the definition of malice, as set forth in section 188, to add a requirement that all principals to a murder must act

9

with express or implied malice to be convicted of that crime.  Sen. Bill No 1437 thus redefined "malice" in section 188 and narrowed the classes of persons liable for felony murder under section 189.  (Stats. 2018, ch. 1015, §§ 2–3.)

With these amendments in place, "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) [including robbery] in which a death occurs is liable for murder only if one of the following is proven:  [¶]  (1) The person was the actual killer.  [¶]  (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.  [¶]  (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e).)

2. *Procedure to Seek Resentencing*

Senate Bill No. 1437 also established a procedure for defendants previously convicted of murder to seek resentencing if they believe they could not currently be convicted of that crime under the amended provisions of sections 188 and 189.  (Sen. Bill No. 1437, § 4 [enacting newly codified section 1170.95].)  Thus, section 1170.95 allows those "convicted of felony murder or murder under a natural and probable consequences theory . . . [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts . . . ."  (§ 1170.95, subd. (a).)

Section 1170.95 envisions three stages of review of a petition for resentencing.  (*People v. Lewis* (2021) 11 Cal.5th 952, 957-958 (*Lewis*).)  At the first stage, the court is tasked with determining the facial sufficiency of

10

the petition—that is, whether it alleges that (1) an accusatory pleading was filed against the petitioner allowing prosecution under the felony murder rule or the natural and probable consequences doctrine (§ 1170.95, subd. (a)(1)); (2) the petitioner was convicted of first or second degree murder following a trial, or pleaded guilty to first or second degree murder in lieu of a trial at which he or she could have been so convicted (*id.*, subd. (a)(2)); and (3) the petitioner could not today be convicted of first or second degree murder because of the 2019 amendments to sections 188 and 189 (*id.*, subd. (a)(3)). (§ 1170.95, subd. (b)(1).)

If the petition is facially sufficient, the court proceeds to the second stage of review. (§ 1170.95, subd. (c); *Lewis*, *supra*, 11 Cal.5th at p. 958) At this stage, the court must appoint counsel, if one has been requested, and entertain briefing on the defendant's entitlement to relief under a prima facie standard. (*Lewis*, *supra*, at p. 959.) If the defendant makes a prima facie showing, the court proceeds to the third stage of review by issuing an OSC and thereafter holding a full hearing to determine whether the defendant is entitled to relief. (§ 1170.95, subd. (d)(1); *Lewis*, *supra*, at p. 958.)

"We review de novo questions of statutory construction. [Citation.] 'Our primary task "in interpreting a statute is to determine the Legislature's intent, giving effect to the law's purpose. [Citation.] We consider first the words of a statute, as the most reliable indicator of legislative intent." ' " (*People v. Law* (2020) 48 Cal.App.5th 811, 819 (*Law*), review granted July 8, 2020, S262490.) "As appellate courts generally do, we apply a deferential standard of review in determining whether the evidence supports any of the trial court's factual findings." (*People v. Rodriguez* (2020) 58 Cal.App.5th 227, 238, review granted March 10, 2021, S266652.) Finally, if procedural

11

error under section 1170.95 is established, the error requires reversal only if it is prejudicial. (*Id.* at p. 245.)

B. *Analysis*

We conclude the trial court properly denied defendant's Petition without issuing an OSC because the record of conviction established, as a matter of law, that defendant is ineligible for relief under section 1170.95.

We first easily dispense with defendant's argument that the trial court erred by relying on *Berardi*. As the California Supreme Court recently held, "[t]he record of conviction will necessarily inform the trial court's prima facie inquiry under section 1170.95, allowing the court to distinguish petitions with potential merit from those that are clearly meritless." (*Lewis*, *supra*, 11 Cal.5th at p. 971.) Accordingly, the trial court did not err by referring to the record of conviction, which included *Berardi*.

We also reject defendant's contention that there was a possibility that the jury applied the natural and probable consequences theory to the conspiracy charge. In support, defendant references a jury instruction which notes that a member of a conspiracy is also criminally responsible for any act of any member of the conspiracy if that act is done to further the conspiracy and the act is the natural and probable consequence of a common plan or design of the conspiracy. But our opinion in *Berardi* reveals that the jury was only instructed on a theory that defendant conspired with May to murder the victim. (*Berardi, supra*, D056544.) This becomes evident in our discussion of defendant's claim of error arising from the trial court's response to a jury note, which asked, "Can there be a conspiracy without 1st degree murder? or can we consider conspiracy w/o 1st degree murder." (*Berardi, supra*, D056544.) While conferring with counsel, the court asked how to word a response that conveyed a defendant cannot be convicted of conspiracy to

12

commit second degree murder. (*Berardi, supra*, D056544.) The court proposed telling the jury that "these defendants are charged in count 1 with conspiracy to commit murder. And then we have to find a way of telling them you can only conspire to commit a first degree murder. There's no conspiracy to commit second degree murder, because second degree murder has no premeditation and deliberation, which is, in essence, presumed by a conspiracy." (*Berardi, supra*, D056544.) Ultimately, the court responded to the jury question as follows: "All conspiracies to commit murder are necessarily premeditated and deliberated. Thus, a defendant can only be found guilty of a conspiracy to commit a first degree murder. A defendant cannot be found guilty of a conspiracy to commit a second degree murder." (*Berardi, supra*, D056544.) On appeal, we deemed this instruction to be an accurate statement of the law and responsive to the question posed. (*Berardi, supra*, D056544; *People v. Cortez* (1998) 18 Cal.4th 1223, 1232.)

The trial court did not err in construing the foregoing as confirmation that defendant's conviction was based on his intent to kill and his conduct in counseling, commanding, inducing, or assisting May in committing the murder. (See *People v. Verdugo* (2020) 44 Cal.App.5th 320, 336, abrogated on other grounds by *Lewis, supra,* 11 Cal.5th 952.) While the trial court must assume that all facts in a section 1170.95 petition are true and should not evaluate their credibility, "it need not credit factual assertions that are untrue as a matter of law." (*People v. Drayton* (2020) 47 Cal.App.5th 965, 980, abrogated on other grounds by *Lewis, supra,* at p. 952.)[3]

---

[3] Having determined that the trial court did not act as a factfinder since the record of conviction establishes defendant's ineligibility as a matter of law, we conclude that there is no merit to defendant's related contention that the trial court "*sub silentio*" applied a substantial evidence standard at the prima facie stage.

Because defendant was not convicted of felony murder or conspiracy to commit murder under a natural and probable consequences theory, section 1170.95 relief is not available to him.  The relevant statutory language does not extend the benefits of Senate Bill No. 1437 to offenders like defendant, whose conviction necessarily included a finding that he had the specific intent to kill.

## DISPOSITION

The order denying defendant's section 1170.95 petition is affirmed.


O'ROURKE, Acting P. J.

WE CONCUR:


AARON, J.


IRION, J.

14